**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| ALICIA BECKETT-CRABTREE, as special administrator for the estate of Brett Crabtree, deceased, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 06-CV-0683-CVE-FHM<br>) |
| ROBERT HAIR, individually and in his official capacity, and BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF WASHINGTON, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**OPINION AND ORDER**

Now before the Court are Defendant Robert Hair's Motion for Summary Judgment and Brief in Support (Dkt. # 47) and Defendant Board of County Commissioners for Washington County's Motion for Summary Judgment and Brief in Support (Dkt. # 49).

**I.**

Robert Hair ("Hair") was employed as a deputy sheriff for the Washington County Sheriff's Office. Hair became certified as a reserve deputy in 1995 and completed the necessary training to become a full-time deputy on November 15, 2002. On September 9, 2005, Hair was patrolling the northbound lanes of Highway 75 in Washington County, Oklahoma with a civilian ride-along, Don McCorkle ("McCorkle"). Hair observed a truck stopped on the shoulder of the highway, and he believed the driver might be in need of assistance. Hair pulled over and turned on his flashing emergency lights. The vehicle did not have a license plate and driver's side door was slightly ajar. Hair reported his location to the dispatcher and initiated contact with the driver.

Before Hair could step out of his patrol car, the driver, Brett Crabtree ("Crabtree"), started to exit his vehicle. Hair used his patrol car's PA system and requested that Crabtree remain in the vehicle. Crabtree's behavior suggested that he was "extremely stressed or under the influence."[1] Dkt. # 47, Ex. 5, at 45. Hair asked Crabtree about the absence of a license plate. Crabtree seemed surprised that the vehicle did not have a license plate, and Hair noticed that Crabtree was reluctant to make eye contact. While talking to Crabtree, Hair looked in the vehicle and saw a syringe and a knife. Hair asserts that Crabtree attempted to cover the syringe and knife with some paper, and Crabtree's behavior increased Hair's concerns that Crabtree was under the influence of drugs. Hair asked Crabtree to exit the vehicle. Without any request from Hair, Crabtree turned toward the truck and placed his hands on the vehicle in the standard position for a pat-down. Hair found Crabtree's behavior unusual, and he requested that Crabtree step away from the vehicle for a pat-down. Hair did not find any weapons on Crabtree's person, but Hair felt that Crabtree was "extremely tense." Id. at 48.

Based on Crabtree's behavior and the syringe in the truck, Hair concluded that Crabtree was under the influence of methamphetamine.[2] Hair decided to handcuff Crabtree, because he believed that Crabtree would attempt to flee or fight. When Hair attempted to handcuff Crabtree, Crabtree broke free and ran into a nearby field. Hair immediately pursued Crabtree into the field and yelled

---

[1] Plaintiff argues that Hair was not qualified to determine whether Crabtree was actually under the influence of a drug during the encounter. However, Hair's observations of Crabtree's behavior and drug paraphernalia in the vehicle suggested that Crabtree was under the influence of a drug and, based on his experience as a law enforcement officer, he had a reasonable basis to infer that Crabtree was under the influence of a drug.

[2] According to plaintiff, Hair did not include this observation in his report nor did Hair relay this information to Oklahoma State Bureau of Investigation ("OSBI") officials in interviews following the incident.

at Crabtree to stop running. Crabtree continued running and hurdled a fence. Hair continued the pursuit and used his radio to notify the dispatcher about his foot pursuit of Crabtree. Crabtree stopped running and Hair recalls that Crabtree assumed a "fighting stance."[3] Id. at 62. Hair ordered Crabtree to drop to the ground and Hair drew his TASER. Crabtree turned around and began to run. Hair fired his TASER at Crabtree's back at a range of approximately 12 to 18 feet, but he missed Crabtree.

Hair pursued Crabtree east through the field until he observed Crabtree crouching behind some weeds. Hair began to approach Crabtree, and Crabtree stood up.[4] Hair ordered Crabtree to get on the ground, but Crabtree remained standing. Hair drew his ASP baton and continued to order Crabtree to get on the ground. Crabtree refused, and Hair attempted to strike Crabtree in the thigh with his ASP baton. Crabtree struggled with Hair, and Crabtree pulled Hair's head toward his chest. During the struggle, Hair dropped his ASP baton. Hair dropped to one knee and Crabtree was on top of Hair attempting to force him to the ground. Hair tried to spin out of Crabtree's grasp, but he was unable to get out from underneath Crabtree. During the struggle, Hair felt pressure on his gun and he believes that Crabtree was trying to remove the gun from its holster. Hair slapped at Crabtree's hands to keep Crabtee from obtaining the gun and he successfully prevented Crabtree

---

[3]   Plaintiff disputes that Crabtree assumed a threatening position, because Hair admits that Crabtree did not raise his fists. Hair states that Crabtree "clinched up" and he felt threatened by Crabtree's stance. Id. at 71-72. The Court notes plaintiff's factual dispute, but it was certainly possible for Crabtree to appear threatening even if he did not raise his fists.

[4]   Defendants once again state that Crabtree took a "fighting stance" against Hair. Dkt. # 47, at 8; Dkt. # 49, at 8. However, Hair's deposition testimony does not support this statement and the Court will not assume that Crabtree took a threatening position against Hair.

from taking the gun.[5]  However, Crabtree was able to push Hair towards the ground and he pinned the right side of Hair's head against the ground.

Crabtree grabbed Hair's flashlight, and hit Hair in the head with the flashlight.  It is unclear if Hair actually lost consciousness, but Hair recalls that he had blurry vision and he felt "groggy."  Dkt. # 47, Ex. 5, at 79.  Terry Johannesen, M.D. ("Dr. Johannesen"), treated Hair after the incident and found that the blow Hair received was strong enough to cause Hair to be temporarily incapacitated.[6]  When Hair recovered from the blow to the head, Crabtree was no longer on top of him.  In his deposition, Hair stated:

> A.   I was almost unconscious and I -- didn't know how bad I was hurt.  I thought he was going to kill me.  I thought that if I didn't act or if I lost consciousness and didn't act, I was -- I was going to be dead.
>
> Q.   Did you -- how did you think that he was going to kill you, I mean?
>
> A.   With the flashlight.

Dkt. # 47, Ex. 5, at 80.  Hair drew his weapon and he remembers firing three shots.  Hair actually fired four shots within three seconds, and two of the shots hit Crabtree.  One shot hit Crabtree in the right elbow and a second shot hit Crabtree in the left side of the head, and Crabtree died as a result of the gunshot wound to the head.

---

[5]   Plaintiff claims that no evidence supports Hair's deposition testimony that Crabtree reached for the gun, because it was not determined if Crabtree's fingerprints were on the gun.  However, the gun was not tested for Crabtree's fingerprints.  Dkt. # 56, Ex. 6, at 25.  The Court will not draw any inference in favor of either party based on the failure to test the gun for fingerprints, and any allegations about the presence or absence of Crabtree's fingerprints on the gun are speculative.

[6]   Dr. Johannesen could not conclusively state that Hair lost consciousness, but he believed that Hair would have felt "dazed" after the blow to the head.  Dkt. # 56, Ex. 14, at 20.  He stopped short of declaring that Hair completely lost consciousness, but he found that the blow was strong enough that it caused Hair to suffer a concussion.

Hair does not recall where Crabtree was located in reference to himself when he fired his gun. Hair believes that his head was positioned close to the ground and he drew his gun while he was on the ground. Hair thought that Crabtree was behind him, but he could not see clearly when he fired his gun. Plaintiff has obtained expert testimony from a ballistics expert, Richard Ernest ("Ernest"), who opines that Crabtree was 21 feet away from Hair when Crabtree was shot in the head. According to Ernest, circumstantial evidence indicates that Crabtree was fleeing at the time he received the fatal shot:

> [T]hree fired cartridge cases ... denote the position of the officer while he fired these three cartridge cases, and if the officer's account is taken to be true his position would be essentially where these three cartridge cases were found. It is likely that one of these fired rounds struck the right elbow of Mr. Crabtree, and was found on the ground as a spent bullet near the asp (baton). . . . The asp and spent bullet are only a short distance (about 5 or 6 feet) to the west (toward the highway) from the fired cartridge cases. It appears that Mr. Crabtree then tried to flee away from the officer toward the highway, and his body is found some 20 to 21 feet to the west (toward the highway) from the fired cartridge cases.

Dkt # 76, at 3. Plaintiff's law enforcement expert, Michael Lyman ("Lyman"), opines that Crabtree was shot in the elbow approximately six feet from Hair. Based on the forensic evidence cited by Ernest, Lyman infers that Crabtree began to flee towards the highway after being shot in the arm, and Crabtree was actively fleeing at the time Hair fired the fatal shot. It is Lyman's opinion that "Crabtree had ceased his aggression, was not posing any further threat to Hair, had distanced himself from Hair and was possibly in the process of attempting to escape at the time he was shot and killed." Dkt. # 77, at 12. Hair does not remember how much time elapsed from the time Crabtree hit him in the head with the flashlight to the moment he fired his gun. Based on videotape submitted by defendants, the total time elapsed from the moment Crabtree ran into the field to the fatal gunshot was approximately 90 seconds.

5

Following the incident, Hair notified the dispatcher that shots had been fired and returned to his patrol car. McCorkle observed that Hair seemed dazed and the collar of Hair's shirt was covered in blood. McCorkle helped Hair into an ambulance and Hair was taken to a hospital for treatment. Hair had a laceration to the posterior scalp and abrasions on the right side of the face. Dr. Johannesen diagnosed Hair with a concussion, but medical records indicate that Hair did not lose consciousness during the incident. Dr Johannesen found that these injuries were consistent with a blow to the head.

As part of the standard procedure following a shooting death, Washington County Sheriff, Patrick Ballard ("Ballard"), notified OSBI and OSBI conducted an investigation of the incident. Agent Jerry Neville ("Neville") assisted the case officer investigating the shooting, and Neville was responsible for interviewing Hair, gathering evidence, and submitting evidence for laboratory testing if such testing was necessary. During his interview, Hair informed Neville that Crabtree "not acting normal[ly]" and Hair believed that Crabtree was "high on something." Dkt. # 47, Ex. 18, at 17. Neville found Hair's description of Crabtree's behavior relevant, and Neville did not find it significant that Hair failed to identify a specific drug that Crabtree may have taken. In fact, drug testing after the shooting confirmed that Crabtree had taken methamphetamine before he was killed on September 9, 2005. Neville took pictures of Hair's injuries and the flashlight, and verified that Hair's clothing and the flashlight had significant blood stains.

As the Sheriff of Washington County, Ballard is responsible for reviewing and adopting policies concerning officer conduct. Ballard believes that Hair acted properly throughout the incident and that Hair was justified in using deadly force to protect himself. According to Ballard, Hair had a duty to chase Crabtree and place him under arrest, because Crabtree was suspected of

committing a crime. Id., Ex. 20, at 47-48. Ballard did not reprimand Hair or find that he violated policy or procedure of the Washington County Sheriff's Office. Plaintiff characterizes Ballard's actions following the incident as a "ratification" of Hair's actions and suggests that Ballard's approval of Hair's conduct should be treated as an official policy of the Washington County Sheriff's Office.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could

7

reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

Hair asserts that he is entitled to qualified immunity from suit under 42 U.S.C. § 1983, because he did not violate Crabtree's constitutional rights on September 9, 2005.  Plaintiff responds by offering "undisputed rules for law enforcement officers" that should have been followed in this case, and she claims that Hair's violation of each of these undisputed rules shows that Hair violated Crabtree's constitutional rights.  The primary thrust of plaintiff's argument is that Hair's reckless or deliberate conduct created a need for deadly force when such force would not otherwise have been necessary, because he acted unreasonably when he pursued Crabtree without waiting for backup.[7]

The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity shields public

---

[7] Plaintiff also argues that Hair used deadly force against Crabtree in retaliation, because Crabtree hit Hair with the flashlight.  Hair has clearly stated that he feared for his life and fired his gun in self-defense.  Plaintiff relies on circumstantial evidence that Crabtree was attempting to flee when Hair fired his gun.  This goes to the reasonableness of Hair's actions, but it does not show that Hair acted with the intention of retaliating against Crabtree. Construing the facts in a light most favorable to plaintiff, the Court finds no basis to infer that Hair was retaliating against Crabtree.

8

officials from facing the burdens of litigations and is an immunity from suit, not simply a defense to plaintiff's claims. Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1150 (10th Cir. 2006). The Tenth Circuit has adopted a three part test to analyze a qualified immunity defense: (1) the court must consider if plaintiff's allegations establish a constitutional violation; (2) if plaintiff has alleged a constitutional violation, the court must examine whether the law was clearly established at the time the alleged violation occurred; and (3) even the law was clearly established, the court must consider any extraordinary circumstances prevented the public official from knowing his actions were unconstitutional. Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir. 2006); Lawrence v. Reed, 406 F.3d 1224, 1230 (10th Cir. 2005). Law is clearly established if "a reasonable official in defendant's situation would have understood that his conduct" violated plaintiff's constitutional rights. Moore v. Guthrie, 438 F.3d 1036, 1042 (10th Cir. 2006). In Hope v. Pelzer, 536 U.S. 741 (2002), the Supreme Court changed this analysis from a "scavenger hunt for prior cases with precisely the same facts" to an inquiry into whether officials had fair notice that their conduct was unconstitutional. Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

Plaintiff bears the burden to prove that his constitutional rights were violated and that the law giving rise to his claim was clearly established at the time the acts occurred. Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The Court must assess the reasonableness of the officer's actions in light of the law existing at the time of the alleged violation and determine whether plaintiff's legal rights were sufficiently clear that a reasonable police officer would have known his conduct violated the law. Id. Plaintiff claims that Hair used excessive force leading up to and during the shooting, and the right to be free from excessive force during an arrest is a clearly established constitutional right.

9

The parties do not dispute that the use of excessive force during an arrest violates a person's rights under the Fourth Amendment, but the parties disagree as to whether Hair used an appropriate level of force in this case. Claims of excessive force are governed by the reasonableness standard of the Fourth Amendment, but this standard is not "capable of precise definition or mechanical application." Graham v. Connor, 490 U.S. 386, 396 (1989). The Court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Scott v. Harris, 127 S. Ct. 1769, 1778 (2007). When weighing the reasonableness of the amount of force used by a police officer, the Tenth Circuit has suggested several factors that district courts should consider:

> The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions. The Fourth Amendment standard requires inquiry into the factual circumstances of every case; relevant factors include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest. The reasonableness standard is "clearly established" in the context of § 1983 actions.

Gross v. Pirtle, 245 F.3d 1151, 1158 (10th Cir. 2001). Deadly force is justified under the Fourth Amendment when "a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." Jiron v. City of Lakewood, 392 F.3d 410 (10th Cir. 2004). It is not unreasonable for a police officer to use deadly force in self-defense. Romero v. Bd. of County Comm'rs of the County of Lake, Colorado, 60 F.3d. 702 (10th Cir. 1995).

Plaintiff relies on two cases, Allen v. Muskogee, Oklahoma, 119 F.3d 837 (10th Cir. 1997), and Carr v. Castle, 337 F.3d 1221 (10th Cir. 2003), to show that Crabtree's constitutional rights

were violated and that his constitutional rights were clearly established on September 9, 2005.[8] In Allen, Terry Allen ("Allen") had an argument with his wife and children, and he left the family's home with guns and ammunition. Allen, 119 F.3d at 839. The argument was reported to the Wagoner County Sheriff's Department, and police sent out a teletype describing Allen and his vehicle. Allen's sister, Rhonda Lee-Oakley ("Oakley") called 911 later that day to report that Allen was parked in front of her house and he was threatening to commit suicide. Lieutenant Donald Smith of the Muskogee Police Department ("MPD") arrived at Oakley's house, and he observed that Allen was sitting in the driver's seat of his car with a gun in his right hand. MPD Officers Bentley McDonald ("McDonald") and Bryan Farmer ("Farmer") arrived to assist Smith. Smith repeatedly ordered Allen to drop the gun, but Allen refused. Smith reached into the vehicle in attempt to take Allen's gun while McDonald tried to hold Allen's left arm. Farmer attempted to open the passenger door and Allen pointed the gun at him. Farmer hid behind the passenger door for cover, and Allen moved his gun in the direction of Smith and McDonald. At that point, police fired 12 rounds into the vehicle. Four of the shots struck Allen, and he died.

---

[8] In response to Hair's motion for summary judgment, plaintiff offers "undisputable rules for law enforcement officers," and she claims that Hair's violation of these undisputed rules requires the Court to deny Hair's motion. Dkt. # 56, at 14-15. Plaintiff argues that Hair's conduct was unreasonable, because his conduct violated these generally-accepted law enforcement practices. However, only one of the "rules" is supported with a citation to a judicial decision. The issue before the Court is not whether Hair's conduct was reasonable but, instead, whether Hair violated Crabtree's constitutional rights and whether those rights were clearly established. When making this determination, the Court must refer to relevant Supreme Court and Tenth Circuit precedent. While the rules submitted by plaintiff may be helpful as a summary of plaintiff's argument, they do not carry the force of law and the Court will not treat them as such. The Court notes the principles cited by plaintiff, but the Court must refer to judicial precedent when determining the scope and potential violation of plaintiff's constitution rights.

Allen's family filed a § 1983 claim against the police officers and the City of Muskogee. The individual officers moved for summary judgment on the ground of qualified immunity and the district court granted their motion. The Tenth Circuit reversed the district court's decision, because it found that genuine issues of material fact precluded summary judgment. Specifically, eyewitnesses presented conflicting evidence about Smith's behavior during the incident. One witness stated that Smith ran up to Allen's car and began shouting at him. However, another eyewitness stated that Smith approached the car cautiously and tried to talk to Allen without escalating the situation. This factual dispute was material, because the Tenth Circuit found that the "officers' preceding actions were so 'immediately connected' to Mr. Allen's threat of force that they should be included in the reasonableness inquiry." Id. at 841. Construing the evidence in the plaintiff's favor, a reasonable jury could have concluded that the police officers acted recklessly and created the need to use deadly force. Id.

Plaintiff also cites Carr as a case where police officers were not entitled to qualified immunity for the use of deadly force. In Carr, Oklahoma City Police Officer Elliot ("Elliot") responded to a call concerning an assault at an apartment building. Carr, 337 F.3d at 1225. The landlord claimed that a tenant, Randall Carr ("Carr"), hit him several times. Elliot waited for backup and Officer Jerry Bowen ("Bowen") arrived. Elliot knocked on Carr's door and, after Elliot repeatedly knocked, Carr opened the door. Elliot described Carr's behavior as "very excited and aggressive." Id. at 1225. Elliot attempted to handcuff Carr, but Carr hit Elliot in the head and kicked Bowen in the groin. Carr ran out of the apartment building and the police pursued him. During the chase, Officer Randy Castle ("Castle") arrived and joined the pursuit. All three officers chased Carr until he came to a fence and was unable to climb it. Carr had picked up a concrete

brick during the pursuit and he ran at Castle with the brick raised as if he intended to throw it at Castle. The police officers fired 11 shots at Carr and killed him. All of the shots that struck Carr entered his back and the medical examiner confirmed that the fatal shot struck Carr while he was on the ground. Carr's family filed a § 1983 claim against the individual police officers and Oklahoma City.

The individual officers moved for summary judgment on the ground of qualified immunity and the district court denied their motion. Construing the facts in a light most favorable to plaintiff, the district court found that Carr was shot when he no longer presented a threat of harm to police. The plaintiff produced evidence that Carr no longer had the concrete brick at the time he was shot and that he was trying to flee. This suggested that he no longer had a weapon at the time he was shot and that police were not under an immediate threat of harm. The Tenth Circuit affirmed the district court's ruling, because the district court was required to resolve factual disputes in plaintiff's favor at the summary judgment stage. Id. at 1227-28. Factual disputes do not automatically preclude summary judgment when, as a legal matter, a defendant could not be held liable to the plaintiff under the facts alleged by plaintiff. Id. However, the factual disputes in Carr were material and summary judgment was not appropriate.

In this case, there are relatively few factual disputes about Hair's and Crabtree's conduct until the point during the encounter when Hair drew his gun. From the beginning of the encounter, Hair felt that Crabtree's behavior indicated that Crabtree could be under the influence of a drug and Hair found drug paraphernalia in the vehicle. Although plaintiff disputes Hair's qualifications to make this assessment, Hair's inference that Crabtree was under the influence of an illegal drug was

13

reasonable under the circumstances.[9] Plaintiff argues that Hair acted unreasonably by pursuing Hair into the field but, given Crabtree's behavior and the drug paraphernalia in the vehicle, Hair had probable cause to suspect Crabtree of a drug-related crime. The Court has not found any law suggesting that a police officer must wait for backup before initiating pursuit of a criminal suspect or that foot pursuit of a suspect, without more, constitutes the unwarranted and unconstitutional escalation of an encounter.

Hair initiated the encounter without any use or threat of physical force, and he increased the level of non-deadly force as Crabtree became more confrontational. Hair started by issuing verbal orders to Crabtree. When Crabtree continued to ignore Hair's orders and fled into the field, it was Crabtree that stopped running and acted as if he intended to fight Hair. Hair unsuccessfully deployed his TASER, and Crabtree continued to flee. After Crabtree stopped running and attempted to hide in some weeds, Hair used his ASP baton in an attempt to bring Crabtree to the ground without using deadly force. It was Crabtree, not Hair, who increased the level of violence by struggling with Hair and reaching for Hair's gun. This did not authorize Hair to indiscriminately use deadly force, but the sequence of events shows that Hair's conduct did not recklessly or deliberately create the need to use deadly force simply by pursuing Crabtree. See Jiron, 392 F.3d at 414-15; Medina, 252 F.3d at 1133.

It is not enough for plaintiff to argue that Hair had options other than deadly force in order to survive summary judgment. As another district court in the Tenth Circuit, considering a

---

[9]   The Court has viewed the DVD of the initial encounter and Hair's assessment of Crabtree's behavior is accurate. Crabtree appears nervous and fidgety, and Hair's suspicions could certainly have been aroused when Crabtree assumed the standard position for a pat-down without a formal request. Even if Hair could not verify what substance Crabtree had taken, Hair's determination that Crabtree appeared to be under the influence was reasonable.

plaintiff's argument that a police officer unreasonably escalated the level of violence by initiating a pursuit without waiting for backup, has stated:

> [The plaintiff] proffers the opinion of its expert . . . that Officer Murr had other options available other than use of deadly force. This may be true, but for the purposes of this analysis, the Court does not need to determine whether Officer Murr's response was the best or most desirable response under the circumstances, only whether Officer Murr's belief and response was a reasonable one. Thus, the question is not whether Officer Murr could have used less-lethal alternatives, but whether it was reasonable for him to use lethal force under these circumstances. To evaluate other possible responses Officer Murr might have taken, would cause the Court to engage in "Monday-morning quarterbacking" prohibited by Jiron and Medina.

Estate of Larsen ex rel. Sturdivan v. Murr, 2006 WL 322602 (D. Colo. 2006). The Court has reviewed Allen and Carr, and finds that they do not clearly establish that Hair's conduct violated plaintiff's constitutional rights. Allen shows that qualified immunity is not appropriate when there is a genuine issue of material fact as to whether the police officer created the need to use deadly force. Carr stands for the proposition that police may not use deadly force against a fleeing and unarmed suspect that poses no immediate threat of harm to the police or the community.

Viewing the facts of this case from the perspective of a reasonable police officer, it was Crabtree that inflicted an injury that caused Hair to suffer vision loss and become disoriented. Hair believed that Crabtree still had possession of the flashlight and plaintiff's expert states that Crabtree was about six feet away from Hair at the time Hair fired his gun. This could cause a reasonable police officer to fear for his life, especially considering Crabtree's erratic behavior and Hair's observation that Crabtree was under the influence of an illegal substance. Even assuming that Crabtree ended up about 21 feet from Hair's position, at the time Hair fired his gun he had a reasonable belief that he needed to use deadly force in self defense. Construing the facts in favor

of plaintiff, the Court finds that plaintiff has not established that Hair's actions violated Crabtree's constitutional rights, and he is entitled to qualified immunity from plaintiff's § 1983 claim.

## IV.

The Washington County Board of County Commissioners ("the County") asserts that it is entitled to summary judgment against plaintiff's § 1983 and wrongful death claims. The County claims that plaintiff has no evidence that an official policy or training practice caused Crabtree's death, and thus it can not be held liable under § 1983. Plaintiff responds that Ballard "ratified" Hair's conduct after the incident, and Hair's actions should be treated as an official action by the County. However, plaintiff does not point to a specific policy enacted by the County nor does plaintiff claim that the County inadequately trained its police officers. The County also claims that it can not be held liable for wrongful death under Oklahoma law, because Oklahoma's Governmental Tort Claims Act, OKLA. STAT. tit. 51, § 151 et seq. ("GTCA") exempts the County from liability when its law enforcement officials are engaging in protective activity . Plaintiff responds that Hair was engaging in a law enforcement activity rather than protective action, and the County can be held liable for Hair's actions under the GTCA.

### A.

Under 42 U.S.C. § 1983, a local government or municipality may be held liable for adopting an official policy or custom causing a violation of constitutional rights, but local governments can not be sued under a respondeat superior theory of liability. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). "[T]o establish municipal liability, a plaintiff must show: 1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged." Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006). It is not enough

16

for a plaintiff to allege that the actions of a governmental employee injured him. Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002). "Instead, it must be shown that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." Seamons v. Snow, 206 F.2d 1021, 1029 (10th Cir. 2000).

In this case, plaintiff claims that Ballard adopted an unconstitutional use of deadly force policy by ratifying Hair's actions after September 9, 2005. However, plaintiff cites no law supporting this legal theory and, in fact, plaintiff's theory runs contrary to established precedent. It appears that plaintiff is trying to find a way to hold the County liable for the alleged negligence of one its employees, and this is precisely the kind of municipal liability that is forbidden under § 1983. Darr v. Town of Telluride, Colorado, 495 F.3d 1243 (10th Cir. 2007) ("A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); Novitsky v. City of Aurora, 491 F.3d 1244 (10th Cir. 2007) (the actions of a city employee establish municipal liability only when the actor has been delegated final policy-making authority); Graves, 450 F.3d at 1218 (city could not be held liable solely due to the acts of an employee). It is not possible for plaintiff to show that the County enacted an unconstitutional policy causing Crabtree's death if Ballard allegedly adopted the unconstitutional policy after Crabtree was killed.

Plaintiff's law enforcement expert, Lyman, admits that the Washington County Sheriff's Office's use of force policy, as written, conforms to national standards. He states that:

> [T]he actual way that the policy is written is in general compliance or generally consistent with the nationally recognized standards, the problem that I have is that Officer Hair, by virtue of his actions in this actions in this case did not abide by that policy . . .

Dkt. # 54, Ex. 11, at 104.  In other words, the official policy adopted by the Washington County Sheriff's Office complied with constitutional standards, but Hair's conduct may have violated those standards.  Lyman suggests that Ballard's ratification of Hair's conduct had a "backlash effect" by affirming the use of deadly force in same or similar circumstances.  Id. at 203.  However, Ballard's subsequent approval of Hair's actions does not show that the County enacted an unconstitutional policy before Crabtree's death.  See D.T. by M.T. v. Indep. Sch. Dist. No. 16 of Pawnee County, Oklahoma, 894 F.2d 1176, 1187 (10th Cir. 1990) (municipalities are not liable for civil rights violations of their employees unless the plaintiff demonstrates an "affirmative link" between police misconduct and an official plan or policy).  Plaintiff has cited no legal authority showing that a municipal or local government can retroactively enact a policy creating a basis for a § 1983 claim and the County is entitled to summary judgment on plaintiff's § 1983 claim.

**B.**

In addition to a § 1983 claim against the County, plaintiff has also filed a state law wrongful death claim against the County under the GTCA.  However, the Court has disposed of all claims over which it has original jurisdiction.  Under 28 U.S.C. § 1367(c), a federal district court may decline supplemental jurisdiction when it has "dismissed all claims over which it has original jurisdiction."  The Court recognizes that it has discretion to retain jurisdiction over a pendent state law claim in some circumstances.  United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966).  However, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  Id. at 726; see also United States v. Botefuhr, 309 F.3d 1263, 1273-74 (10th Cir. 2002) ("a district court should normally dismiss

18

supplemental state law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial").

In this case, the Court finds that summary judgment should be entered in favor of Hair and the County on plaintiff's federal law claims, and the sole surviving claim is a wrongful death claim against the County under the GTCA. The preferred procedure in such cases is to dismiss the state law claim without prejudice to refiling in state court. See Sullivan v. Scoular Grain Co. of Utah, 930 F.2d 798, 803 (10th Cir. 1991). The state law claim does not present any issue that would implicate federal law and, in fact, it involves the application of an unsettled statutory exemption under the GTCA. Ashley Creek Phosphate Co. v. Chevron USA, Inc., 315 F.3d 1245, 1264 n.18 (10th Cir. 2003). Although not such a novel or complex issue of state law that it would independently require dismissal without prejudice under § 1367(c)(1), this factor suggests that the Court should exercise its discretion to dismiss plaintiff's state law claim without prejudice. See Gibbs, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties . . ."). The Court finds that, in the interests of comity and for the benefit of the parties, plaintiff's state law wrongful death claim should be dismissed without prejudice.

**IT IS THEREFORE ORDERED** that Defendant Robert Hair's Motion for Summary Judgment and Brief in Support (Dkt. # 47) is **granted**. Defendant Board of County Commissioners for Washington County's Motion for Summary Judgment and Brief in Support (Dkt. # 49) is **granted in part** and **moot in part**: the County is entitled to summary judgment on plaintiff's § 1983 claim, but the Court declines to exercise supplemental jurisdiction over plaintiff's state law negligence claim. A separate judgment is entered herewith as to plaintiff's § 1983 claims against Hair and the County.

**IT IS FURTHER ORDERED** that plaintiff's state law negligence claim is **dismissed without prejudice** to refiling in state court. This is a final order terminating this case.

**DATED** this 6th day of November, 2007.

*/s/ Claire V. Eagan*
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT